**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

HAKEEMA WILLIAMS,           :

         Plaintiff,       :

        v.            :

CARS & SUV OUTLET 2,      :
ROBERTO CARLOS MARTINIERE,   :  Civil Action No.: 11-cv-02360
CREDIT ACCEPTANCE CORPORATION,  :

       Defendants.     :

**FIRST AMENDED COMPLAINT**
**CIVIL ACTION:**
**FRAUD:  (4010)**
**PARTIES**

**A.**    **Jurisdiction and Venue**

    1.     Federal jurisdiction does not lie in this matter. There is no federal question and there is no diversity.

**B.**    **Parties**

    2.     Plaintiff, Ms. Hakeema Williams, is an adult individual presently residing at 2713 Winton Terrace, Philadelphia, PA  19145.

    3.     Defendant, CAR & SUV OUTLET 2 is a corporation licensed to do business in the Commonwealth of Pennsylvania, regularly conducting business in the City of Philadelphia and having a principal place of business with a registered corporate headquarters located at 7104 Frankford Avenue, Philadelphia, PA  19135; at all times relevant, acting alone or in concert with others, formulated, directed, concealed, controlled, conspired, substantially assisted, enabled and/or participated in the acts and practices set-forth in this Complaint.

1

4.      Defendant, ROBERTO CARLOS MARTINIERE, is a supervising agent and/or employee of CAR & SUV OUTLET 2 and holds a management position at and/or with said Defendant, and at all times relevant, acting alone or in concert with others, formulated, directed, concealed, controlled, conspired, substantially assisted, enabled and/or participated in the acts and practices set forth in this Complaint.

5.      Defendant, CREDIT ACCEPTANCE CORP. is a corporation licensed to do business in the Commonwealth of Pennsylvania, that regularly does business in Philadelphia County, and that has headquarters located at 25505 West Twelve Road, Southfield, MI  48034; and at all time relevant, acting alone or in concert with others, formulated, directed, controlled, conspired, substantially assisted, enabled and/or participated in the acts and practices set-forth in this Complaint.

C.      **Factual Allegations**

6.      At all times relevant hereto, defendants acted by and through their agents, servants, and employees who acted within the scope of their authority and within the course of their employment.

1.      On or about February 16, 2008, Hakeema Williams visited the Car & SUV Outlet 2 which was owned and/or operated by Michael Frost, and purchased a 2002 Pontiac Bonneville (Exhibits A-B).

2.      Prior to the execution of any contracts, the Defendants' agents, including but not limited to MARTINIERE, and/or those identified on the attached document(s), made the following representations expressly and/or impliedly about the subject vehicle:

> a)      the subject vehicle had 136,386 miles on it at the time ownership was transferred to Plaintiff;
>
> b)      the odometer reading and disclosure statement reflected the actual mileage;
>
> c)      the odometer reading and disclosure statement was reliable and accurate;
>
> d)      the subject vehicle had not been damaged or been involved in any accidents;
>
> e)      the subject vehicle was in good, safe and operable condition;

2

f)      the subject vehicle was free of defects;

g)      Plaintiff was being charged lawfully for taxes;

I)      Plaintiff was being charged lawfully amounts paid to public officials for title, registration and lien fees;

j)      Defendants were charging a lawful documentary fee;

k)      Defendants would transfer lawfully Title and registration;

l)      the sale was conducted and the paperwork was completed lawfully.

3.      Prior to the execution of any agreements, the Defendants' agents, including Gallese, and/or those identified on the attached document(s), concealed the following facts from the Plaintiffs about subject vehicle:

a)      the vehicle was defective and in a state of disrepair;

b)      the vehicle was unfit and unmerchantable;

c)      the defendants did not conduct the transaction or complete paperwork lawfully;

d)      the defendants charged an unlawful documentary fee;

e)      the defendants did not transfer Title ownership unlawfully.

4.      By a Buyer's Order (BO) and Retail Installment Sales Contract dated February 16, 2008 (RISC) (Exhibits A and B), the plaintiff and Defendants ostensibly and apparently agreed to the terms for the financial purchase/sale 2002 Pontiac Bonneville (VIN: 1G2HX54KX24152052).[1]

5.      The subject vehicle was sold in a defective condition.

6.      The defendants did not transfer Title ownership to plaintiff.

7.      The Bonneville RISC was sold and assigned to defendant CAC.

8.      When the Bonneville broke down plaintiff demanded that the defendants take it back.

---

[1] Under Pennsylvania Law, the RISC controls a financed motor vehicle purchase.

9.      Defendant CAR & SUV OUTLET 2 and MARTINIERE sold plaintiff another vehicle, a 2004 Chevrolet Impala.

10.     Defendants required plaintiff to pay an additional $200.

11.     Prior to the execution of any contracts, the Defendants' agents, including but not limited to MARTINIERE, and/or those identified on the attached document(s), made the following representations expressly and/or impliedly about the subject vehicle:

    a)    the subject vehicle had 95,773 miles on it at the time ownership was transferred to Plaintiff;

    b)    the odometer reading and disclosure statement reflected the actual mileage;

    c)    the odometer reading and disclosure statement was reliable and accurate;

    d)    the subject vehicle had not been damaged or been involved in any accidents;

    e)    the subject vehicle was in good, safe and operable condition;

    f)    the subject vehicle was free of defects;

    g)    Plaintiff was being charged lawfully for taxes;

    I)    Plaintiff was being charged lawfully amounts paid to public officials for title, registration and lien fees;

    j)    Defendants were charging a lawful documentary fee;

    k)    Defendants would transfer lawfully Title and registration;

    l)    the sale was conducted and the paperwork was completed lawfully.

12.     Prior to the execution of any agreements, the Defendants' agents, including MARTINIERE, and/or those identified on the attached document(s), concealed the following facts from the Plaintiffs about subject vehicle:

    a)    the vehicle was defective and in a state of disrepair;

    b)    the vehicle was unfit and unmerchantable;

    c)      the defendants did not conduct the transaction or complete paperwork lawfully;

    d)      the defendants charged an unlawful documentary fee;

    e)      the defendants did not transfer Title ownership unlawfully.

13.     By a Buyer's Order (BO) and Retail Installment Sales Contract dated February 16, 2008 (RISC) (Exhibits C and D), the plaintiff and Defendants ostensibly and apparently agreed to the terms for the financial purchase/sale 2004 Chevrolet Impala (VIN: 2G1WF52EX49358466).

14.     As part of the purchase, CAR & SUV OUTLET 2 and Frost had promised to and were supposed to transfer Title ownership to Ms. Williams and submit records to the Commonwealth to transfer permanent registration to Ms. Williams (Exhibit D).

15.     The subject Impala RISC was sold and assigned to CAC.

16.     Defendants never transferred Title ownership of the subject Impala to plaintiff and did not submit the necessary paperwork to the Commonwealth for permanent registration to be transferred into plaintiff's name.

17.     On or about December 26, 2008, the Philadelphia Police seized the subject Impala, because it stolen plates.

18.     Plaintiff called defendants and complained that she had not received Title ownership and that the vehicle had been taken from her.

19.     Plaintiff has not been able to use the vehicle since it was taken from her.

20.     Plaintiff called Credit Acceptance, reported the fraud, cancelled the contract and requested that Credit Acceptance open an investigation.

21.     Credit Acceptance told plaintiff that her complaints were between her and the dealer and refused to recognize her right to cancel the contract and refused to investigate.

22.     On November 4, 2010, plaintiff sent Credit Acceptance a request for account information pursuant to 13 Pa.C.S.A. § 9210 (Exhibit E).

23.     Credit Acceptance never responded to plaintiff's request.

24.     Credit Acceptance called plaintiff many times, harassed her, threatened her with legal action and with damaged credit, and damaged her credit.

25.     Despite full knowledge of the circumstances, Credit Acceptance tried to intimidate plaintiff into paying additional money.

26.     Upon information and belief, Credit Acceptance had requested and/or demanded that CAR & SUV OUTLET 2 repurchase the contract from Credit Acceptance.

27.     CAC repossessed the subject Impala.

28.     At the time either Credit Acceptance or the sellers took plaintiff's vehicle, plaintiff was not in default of the subject RISC.

29.     At the time that defendants took plaintiff's vehicle, no one other than plaintiff had a present right of possession of the vehicle.

30.     The Pennsylvania Motor Vehicle Sales Finance Act (MVSFA) requires a creditor such as Defendants to disclose as the "amount financed" or the amount of credit of which the consumer has actual use.

31.     The MVSFA defines "credit" as the right granted by a creditor to a debtor to defer payments of debt or to incur debt and defer its payment.

32.     The RISC stated a specific "amount financed" in connection with the transaction.

33.     The RISC stated a specific "finance charge."

34.     The RISC stated a specific Annual Percentage Rate (APR).

35. Defendants did not give Plaintiff a copy of the written disclosures in a form for Plaintiff to keep before Plaintiff had actually signed the RISC.

36. Although Defendants began charging Plaintiff interest on the amount financed shown in the RISCs on February 16, 2008 and April 12, 2008 respectively, pursuant to its established business practice, it did not provide Plaintiff with actual use of that amount financed on that date.

37. The only way for Defendants to provide actual use of the amount financed to Plaintiff was for them to give up that amount of value to Plaintiff; after it gave up that value, it could then charge him interest on that amount.

38. As a seller-creditor, the only way for Defendants to give up that amount of value to plaintiff was for Defendants to provide the vehicle as represented and promised, fulfill their other obligations under the RISC, such as making payments to public officials, sign the Title of the car over to plaintiff, and to refrain from interfering with her quiet enjoyment and possession of the vehicle; merely giving her temporary possession of the vehicle was not providing her actual use of the amount financed worth of credit.

39. Defendants represented that they were signing the Title Certificate of the car over to plaintiff by representing that it would process the Title with the Department of Motor Vehicles, by acting as an agent of the Department of Motor Vehicles to provide her with a temporary tag and a temporary registration, and by using various contract documents that asserted that she was the owner of the car and was giving up a security interest in the car.

40. Although Defendants gave plaintiff possession of the car on February 20, 2010, because defendants did provide the vehicle as represented and promised, did not forward the amounts to the Commonwealth, and/or did not transfer properly Title ownership, did not recognize plaintiff as the owner, it did not give his actual use of that credit that day.

## ADDITIONAL ALLEGATIONS

41.     Defendants never expressed in any manner any allegation that plaintiff supplied any false or unverifiable information in connection with the transaction.

42.     Defendants never expressed in any manner any allegation that any of defendants actions were as set forth herein were taken as a result of any false or unverifiable information supplied by the Plaintiff.

43.     The Plaintiff has no experience in or specialized knowledge related to the automotive industry, and/or related to motor vehicles, motor vehicle sales, motor vehicle repair, and/or consumer finance.

44.     At all times relevant, Defendants promised to take good care of the Plaintiff.

45.     Defendants stood in a position of trust and confidence.

46.     Plaintiff surrendered substantial control over the financing of the subject purchase.

47.     By virtue of their position of trust and confidence, their unequal sophistication and expertise, defendants had the means to take advantage and exercise undue influence over plaintiff.

48.     The purchase of a motor vehicle is one of the largest investments that many, if not most, consumers make.

49.     The subject purchase was the plaintiff's first or second greatest investment.

50.     The Defendants stood in a fiduciary relationship with the plaintiff.

51.     The Defendants exploited their fiduciary relationship by deceiving the plaintiff regarding the party's respective rights and duties under the RISC, and concealing the nature of Defendant's conduct (misconduct).

52.     The established business practices discussed in the preceding paragraphs caused plaintiff(s) to misunderstand how defendants were treating the Credit Contract, prevented or caused a

delay in receiving Title ownership, caused plaintiff to suffer, annoyance, embarrassment, fear, and other general distress damages, and caused plaintiff to be denied the benefits of the consumer protection statutes specifically designed to protect her.

53.     The sellers and Credit Acceptance are in the business and regularly extend credit to consumers in the manner described above.

54.     The sellers are licensed installment sellers in the Commonwealth of Pennsylvania.

55.     CAC is a licensed finance company in the Commonwealth of Pennsylvania.

56.     The subject vehicle was purchased by the plaintiff primarily for personal use.

57.     The Defendants induced and entered into the subject purchase-sale agreements with a then present and conscious intention to breach, reject, and/or refuse to honor their obligations under said agreement.

58.     The established business practices discussed in the preceding paragraphs were created, implemented, approved, and/or supervised by the Defendants.

59.     As a result of the Defendants' unlawful actions, the plaintiff has been deprived of the use of the vehicle, has incurred expenses for replacement transportation, has suffered damage to her credit rating and credit reputation, and has suffered extreme emotional distress, frustration, humiliation, and/or embarrassment.

60.     Plaintiff has been and will continue to be financially damaged due to Defendants' intentional, reckless, wanton, and/or negligent failure to honor their contractual obligations and the damage to their credit rating and reputation.

61.     During all times relevant the Defendants deceived the plaintiff into believing Defendants' actions were lawful, and/or concealed their actions' unlawful nature.

62.     At all times relevant, the Plaintiff relied on Defendants' apparent and claimed experience, sophistication and expertise in inspecting, repairing, selling and/or financing motor vehicles.

## CREDIT ACCEPTANCE

63.     Pursuant to the express terms of the RISC, State common law of assignments, and Statutory law, Credit Acceptance "stepped into the same shoes" as the Dealer Defendants and became derivatively, jointly, severally and fully liable for all of the Dealer Defendants' misconduct.

64.     Plaintiff advised defendant Credit Acceptance of the dealer's misconduct as alleged herein and defendant Suntrust refused to acknowledge its potential derivative liability.

65.     Defendant Credit Acceptance denied that the dealer's misconduct could in any way affect the parties' respective rights and duties under the RISC.

## PATTERN AND PRACTICE

66.     According to Pa.R.E. 404(b)(2), "[e]vidence of other crimes, wrongs, or acts may be admitted [into evidence] for other purposes, such as proof of **motive**, opportunity, **intent**, **preparation**, **plan knowledge**, identity or **absence of mistake or accident**." Pa.R.E. 404(b)(2) (emphasis added).

67.     Credit Acceptance has taken advantage of numerous consumers.

68.     Credit Acceptance routinely tries to deceive and intimidate consumers into making payments on RISCs that it knows were obtained fraudulently and are unenforceable.

69.     Credit Acceptance has routinely tried to deceive and intimidate consumers into making payment on RISCs even where the seller has not transferred the Title ownership into the consumer's name.

70.     Credit Acceptance has routinely tried to deceive and intimidate consumers into making payment on RISCs even where the seller had misrepresented the vehicle's history, condition and value.

## DENNIS BYRD

71.     On or around July 12, 2007, Mr. Byrd visited a dealership located at 3301 Welsh Road, Philadelphia, Pennsylvania after viewing an ad in a local trade paper which advertised a used 2003 Pontiac Grand Prix [hereinafter "the vehicle"] for $7,500.

72.     When Mr. Byrd discussed price of the vehicle at the dealership, the seller, Michael Frost, advised Mr. Byrd that the price was higher than the advertised price at $14,000.

73.     Neither in the newspaper ad nor in exchanges with Mr. Byrd or in any writing did the seller disclose that the vehicle had previously been a commercial fleet vehicle.

74.     Mr. Byrd made a down payment of $4,000 towards purchase of the vehicle, signed sale documents, financing documents, and drove the car from the dealership.

75.     By a Buyer's Order (BO) and Retail Installment Sales Contract (RISC) dated August 11, 2007 (RISC), the Mr. Byrd ostensibly and apparently agreed to the terms for the purchase/sale of a 2004 Pontiac Grand Prix (VIN: 2G2WP522841344174) ("Vehicle") (Exhibit F).

76.     At the time he left the dealership, the seller gave Mr. Byrd temporary tags for the car, but, unknown to Mr. Byrd, the dealer did not transfer Title ownership or registration into Mr. Byrd's name.

77.     The seller contacted Mr. Byrd after purchase of the vehicle and advised falsely that the loan had not been approved and that Mr. Byrd should return to the dealership.

78.     When Mr. Byrd returned, Frost demanded an additional $2,000 from Mr. Byrd to keep the car.

79.     Mr. Byrd refused and advised Frost that he had already paid CAC the first payment under the financing agreement he had signed.

80.     Thereafter, Mr. Byrd paid the 2nd payment under the financing agreement with Credit Acceptance Corp (CAC).

81.     When the statement from CAC was late in coming, Mr. Byrd inquired of CAC and was advised that the sale and financing contracts had been "cancelled" by the dealer and therefore the insurance was cancelled – though CAC knew that the dealer would have no right to do so.  When Mr. Byrd objected and asked CAC for help, CAC refused and told Mr. Byrd that it was between him and the dealer and advised Mr. Byrd to direct further inquiries regarding the matter to the dealer.

82.     Frost engaged in a pattern of harassment against Mr. Byrd in an effort to repossess the vehicle including but not limited to:

a)      Repeatedly calling and threatening Mr. Byrd at home as to repossession of the vehicle while making defamatory statements such as calling him a "shithead";

b)      Repeatedly calling Mr. Byrd's place of employment to advise his employer that Mr. Byrd ha stolen the car.

83.     On or about October, 2007, Frost unlawfully took possession of the vehicle.

84.     Mr. Byrd's nephew visited the dealer's lot to regain the vehicle.

85.     Frost agreed to return the vehicle and "redo the paperwork" in exchange for a further $600.00 payment.

86.     Mr. Byrd's nephew returned five (5) times to the dealership thereafter to complete the paperwork and regain the vehicle.

87.     On or about October, 2007, CAC returned one of Mr. Byrd's monthly payments.

88.     On or about October 16, 2007, Mr. Byrd sent a letter to CAC demanding a statement of account which CAC responded to by only sending a copy of the retail installment contract for the vehicle that had been assigned to CA (Exhibit G).

**JEFF STONE**

89.    On or about April 25, 2007, Mr. Jeff Stone purchased a 2001 Ford Truck Explorer from Cars & SUV Outlet (Exhibit H).

90.    Cars & SUV Outlet sold and assigned the RISC to CAC.

91.    Cars & SUV Outlet did not transfer Title ownership to Mr. Stone (Exhibit I).

92.    As a result of not receiving Title ownership, permanent registration and therefore could nto use the vehicle.

93.    Mr. Stone advised CAC about never receiving Title ownership, not being able to use the vehicle, and rescinding and revoking the deal.

94.    CAC told Mr. Stone that his complaints were between him and the dealer.

95.    CAC harassed Mr. Stone for payment on the RISC (Exhibit J).

**GLYNNIS JACKSON**

96.    On or around February 20, 2010, Glynnis Jackson visited the S&S Motors dealership at 71 Chester Pike, Philadelphia, PA.

97.    By a Buyer's Order (BO) and Retail Installment Sales Contract dated February 20, 2010 (RISC) (Exhibit K), the Ms. Jackson the sellers ostensibly and apparently agreed to the terms for the financial purchase/sale 2001 Hyundai Sonata (VIN: KMHWF25S61A352277).[2]

98.    The Jackson vehicle was in a severe accident in or around June 2008 and sustained substantial damage, including a damaged frame and structure.

99.    The Jackson vehicle was involved in and was severely damaged multiple times before it was sold to plaintiff.

100.    The Jackson vehicle was sold with a damaged frame and structure and in an unfit, unmerchantable, non-roadworthy, defective and dangerous condition.

101.    The seller did not transfer the Title Certificate to Ms. Jackson until March 27, 2010 (Exhibit L).

102.    The Title lists the seller as S&S Auto Sales (Exhibit L).

103.    The Jackson vehicle was not involved in any accidents and was not damaged since the subject sale.

104.    Within a month of the purchase, the Jackson vehicle failed Pennsylvania state inspection.

105.    Within a month of the purchase, the Jackson vehicle stopped working.

106.    Within a month of the purchase, a mechanic at Tonys Auto Repair advised Ms. Jackson that it required a replacement of the drive shaft.

107.    When informed that the Jackson vehicle had been recently purchased, the aforementioned mechanic told Ms. Jackson that she should contact and attorney and consider suing the seller.

108.    The Jackson vehicle was in for repairs for three weeks.

109.    Ms. Jackson picked up the vehicle on April 30, 2010 and paid $2,113.11 for various repairs (Exhibit M).

110.    The same day that Ms. Jackson picked up the vehicle the engine started knocking and it was towed back to the repair shop.

111.    The Jackson vehicle needs a new engine and timing belt.

112.    Ms. Jackson has not been able to use the Jackson vehicle since April 30, 2010.

113.    Ms. Jackson drove the Jackson vehicle a grand total of 50 miles.

114.    Ms. Jackson attempted to have the Jackson vehicle inspected by an expert, but when the expert went to Tonys Auto Repair, the expert was told that the bank, Credit Acceptance had repossessed it and another vehicle sold by the same dealer.

115.    Credit Acceptance has denied that it repossessed the vehicle.

---

[2] Under Pennsylvania Law, the RISC controls a financed motor vehicle purchase.

116. Ms. Jackson complained to S&S Motors many times and was given the run-a-round.

117. Ms. Jackson called Credit Acceptance, reported the fraud, cancelled the contract and requested that Credit Acceptance open an investigation.

118. Credit Acceptance told Ms. Jackson that her complaints were between her and the dealer and refused to recognize her right to cancel the contract and refused to investigate.

119. Ms. Jackson's attorney sent Credit Acceptance a letter dated November 10, 2010, placing it on explicit notice of Ms. Jackson's claims, and canceling, revoking, rejecting and/or rescinding the contract, and again requesting an investigation (Exhibit N).

120. Credit Acceptance responded by email and denied having taken the vehicle and denied any responsibility and stating erroneously that only Prime Motors could terminate the contract (Exhibit O).

121. Credit Acceptance also stated erroneously that its liability was capped by the amounts Ms. Jackson had paid into the contract (Exhibit O).

122. In reality, there is no cap to Credit Acceptance liability under state law. In fact, state law forbids any limitation of an assignee's liability. 69 P.S. 615F&G.

123. On August 24, 2010, Ms. Jackson sent Credit Acceptance a request for account information pursuant to 13 Pa.C.S.A. § 9210 (Exhibit P).

124. Credit Acceptance never responded to Ms. Jackson's request.

125. Credit Acceptance called Ms. Jackson many times, harassed her, threatened her with legal action and with damaged credit, and damaged her credit.

126. Despite full knowledge of the circumstances, Credit Acceptance tried to intimidate Ms. Jackson into paying it an additional $2000.00.

127. Upon information and belief, Credit Acceptance had requested and/or demanded that Prime Motors, Inc. and/or S&S Auto Sales repurchase the contract from Credit Acceptance.

128.    At the time either Credit Acceptance or the sellers took Ms. Jackson's vehicle, Ms. Jackson was not in default of the subject RISC.

129.    At the time that defendants took Ms. Jackson's vehicle, no one other than Ms. Jackson had a present right of possession of the vehicle.

### CREDIT ACCEPTANCE V. FROST

130.    In September 2001, CAC sued Michael Frost in the Philadelphia Court of Common Pleas for fraud the nature of which involved Frost selling vehicles from his inventory without paying off the CAC floor plan line of credit used to acquire the vehicles and not transferring Title ownership to the consumers.  CAC successfully sued for return of the Title ownership and/or compensation of those vehicles, see Credit Acceptance et al. v. Michael Frost et al., Phila CCP No. 0109 02664 (Exhibit Q).

131.    As a result of the aforementioned litigation, CAC knew of Frost's fraudulent business practices when the aforementioned consumers called to report Frost's misconduct and to request CAC's assistance and yet CAC refused information or assistance to these consumers.

132.    CAC never advised the aforementioned consumers of the prior litigation involving Frost or of Frost's business practices.

133.    Despite Frost's demonstrated fraud, CAC continued its business relationship with Frost the direct result of which was Frost's continued his fraudulent business causing the aforementioned consumers' damages as described herein.

134.    Frost's fraud and misconduct was a natural and probable result of CA's substantial assistance to Frost after having knowledge of Frost's dishonest practices.

135.    CAC has tricked and intimidated numerous other consumers around the country to pay additional monies when and where CAC was aware that said consumers had not received Title ownership to the purchased vehicles.

136.    As part of its standardized business practices, CAC continues to seek payment on RISCs that it knows are unenforceable due to the seller's fraud, including the seller's failure to convey Title ownership to the purchased vehicle.

**COUNT I**
**FRAUD**
**PLAINTIFF v. ALL DEFENDANTS**

137.    Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

138.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

139.    Prior to the execution of any contracts related to the Bonneville purchase, the Defendants' agents, including but not limited to MARTINIERE, and/or those identified on the attached document(s), made the following representations expressly and/or impliedly about the subject vehicle:

   a)    the subject vehicle was in good, safe and operable condition;

   b)    the subject vehicle was free of defects;

   c)    Plaintiff was being charged lawfully for taxes;

   d)    Plaintiff was being charged lawfully amounts paid to public officials for title, registration and lien fees;

   e)    Defendants were charging a lawful documentary fee;

   f)    Defendants would transfer lawfully Title and registration;

   g)    the sale was conducted and the paperwork was completed lawfully.

140.    Prior to the execution of any agreements related to the Bonneville purchase, the Defendants' agents, including MARTINIERE, and/or those identified on the attached document(s), concealed the following facts from the Plaintiffs about subject vehicle:

   a)    the vehicle was defective and in a state of disrepair;

   b)    the vehicle was unfit and unmerchantable;

c)      the defendants did not conduct the transaction or complete paperwork lawfully;

d)      the defendants charged an unlawful documentary fee;

e)      the defendants did not transfer Title ownership unlawfully.

141.    Prior to the execution of any contracts related to the Impala purchase, the Defendants' agents, including but not limited to MARTINIERE, and/or those identified on the attached document(s), made the following representations expressly and/or impliedly about the subject vehicle:

a)      the subject vehicle had not been damaged or been involved in any accidents;

b)      the subject vehicle was in good, safe and operable condition;

c)      the subject vehicle was free of defects;

d)      Plaintiff was being charged lawfully for taxes;

e)      Plaintiff was being charged lawfully amounts paid to public officials for title, registration and lien fees;

f)      Defendants were charging a lawful documentary fee;

g)      Defendants would transfer lawfully Title and registration;

h)      the sale was conducted and the paperwork was completed lawfully.

142.    Prior to the execution of any agreements, the Defendants' agents, including MARTINIERE, and/or those identified on the attached document(s), concealed the following facts from the Plaintiffs about subject vehicle:

a)      the vehicle was defective and in a state of disrepair;

b)      the vehicle was unfit and unmerchantable;

c)      the defendants did not conduct the transaction or complete paperwork lawfully;

d)      the defendants charged an unlawful documentary fee;

e)      the defendants did not transfer Title ownership unlawfully.

143.    The misrepresentations and omissions identified in the immediately preceding paragraphs, were known or should have been known to Defendants to be false when made, were material in nature, and were made with the intent to deceive, defraud and/or induce the Plaintiff, and in fact, induced him to purchase the automobile at the price listed in the purchase agreement.

144.    The Defendants knew that the Plaintiff had no special knowledge in the purchase, financing and condition of automobiles and would rely on their representations.

145.    The Plaintiff relied on the Defendants' misrepresentations and was induced to sign the RISC and other documents related to which he apparently and ostensibly purchased and financed the aforementioned automobile at the inflated amount listed in the purchase agreement.

146.    As a result of the aforementioned conduct, the Plaintiff suffered the damages outlined above and below.

147.    The Defendants' actions as hereinbefore described were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

**COUNT II**
**BREACH OF CONTRACT**
**PLAINTIFF v. ALL DEFENDANTS**

148.    Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

149.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

150.    This and all subsequent causes of action are pleaded in the alternative and/or in addition to Plaintiff's cause of action for fraud.

151.    In the alternative, on February 16, 2008 and April 12, 2008, plaintiff apparently and/or ostensibly was misled to believe that she had contracted with Defendants for the purchase of the vehicle as

well as taxes, registration, tags, service contract, and transfer of title, which agreement was final and included all payment and financing terms.

152.    Plaintiff performed or satisfied all of her obligations under the aforementioned finance purchase agreement.

153.    The Plaintiff was at no time relevant in default.

154.    Defendants are in breach of the aforementioned contract in that they have in the past and continue without justification to negligently, intentionally, willfully, fraudulently, and/or recklessly failed and/or refused to deliver to plaintiff the car for which plaintiff contracted under the agreed terms and/or demanded the return of the vehicle or deprived plaintiff of the quiet enjoyment of the vehicle or the amount of credit promised.

155.    The Defendants breached and/or anticipatorily breached all of the agreements thereby relieving plaintiff of any duty to perform thereunder.

156.    As a result of Defendants' breach, the plaintiff suffered the damages outlined above and in the following additional ways:

     a.    increased purchase costs;

     b.    damaged credit rating and reputation;

     c.    deprived of the use and enjoyment of the vehicles;

     d.    incurred cost of replacement vehicles;

     e.    spent time resolving problems created by Defendants' breach;

     f.    incurred other incidental and consequential damages, including emotional distress; and,

     g.    incurred increased interest and other expenses for financing the purchase of the vehicle.

157.    The Defendants' actions as hereinbefore described were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

**COUNT III**
**NEGLIGENCE**
**PLAINTIFF v. ALL DEFENDANTS**

158.    Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

159.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

160.    The Defendants were negligent in the following respects:

a.    failing to institute appropriate policies and procedures to comply with the applicable laws;

b.    failing to institute policies, train personnel, and supervise personnel regarding lawful financing and/or sales presentations;

c.    failing to institute policies, train personnel, and supervise personnel regarding proper pre-sale inspections of vehicles;

d.    failing to institute policies, train personnel, and supervise personnel regarding Title transfers;

e.    failing to institute policies, train personnel, and supervise personnel regarding financing agreements;

f.    failing to institute policies, train personnel, and supervise personnel regarding sales of and performance obligations related to service contracts.

g.    failing to hire competent and/or honest personnel, such as mechanics and salespeople;

h.    failing to properly train and/or supervise its personnel;

i.    failing to honor RISCs and their other promises and representations described more fully above and below.

j.    failing to properly inspect the vehicle, detect defects therein, and/or report said defects to the Plaintiff;

k.    violating 13 Pa.C.S.A. § 101 et seq., 75 Pa. C.S.A. § 7131 et seq., 69 P.S. § 601 et seq., 37 PaC. § 301 et seq.

161.    Plaintiff suffered actual damages proximately caused by Defendants' negligence as alleged above.

162.    The Defendants' actions as hereinbefore described were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**PLAINTIFF v. ALL DEFENDANTS**

163.    Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

164.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

165.    The conduct of the Defendants as alleged in addition to and in the alternative constituted separate negligent misrepresentations that were false because of the failure to exercise reasonable care or competence in obtaining or communicating the information, including but not limited to misrepresentations about the history, condition and safety of the vehicle and the terms of sale and financing and related to the transfer of Title ownership.

166.    The Defendants supplied information including but not limited to that the vehicle was formerly owned and operated by the dealer owner, that the paperwork was being completely lawfully, and that defendants were charging plaintiff lawfully for title, registration, lien recording, and aftermarket products, which induced plaintiff to purchase the vehicle and/or taking or refraining from taking action with respect to the vehicle, such as returning the vehicle or rescinding the purchase contract and/or filing suit.

167.    As a direct and proximate result of these negligent misrepresentations, the Plaintiff suffered damages as alleged.

## COUNT V
## BREACH OF FIDUCIARY DUTY, AND
## COVENANTS OF GOOD FAITH AND FAIR DEALING
## PLAINTIFF v. ALL DEFENDANTS

168.   Plaintiff incorporates all facts and allegations set forth in this Complaint.

169.   As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

170.   At the Defendants' request and inducement, the Plaintiff surrendered substantial control over their financing of the subject purchase.

171.   At all times relevant, Defendants promised to take good care of the Plaintiff and take care of all matters related to the purchase, financing, and titling of the subject vehicle.

172.   Plaintiff financed purchase of the subject vehicles was Plaintiff's single greatest investment.

173.   Defendants stood in a position of trust and confidence.

174.   By virtue of their position of trust and confidence, their unequal sophistication and expertise, Defendants had the means to take advantage and exercise undue influence over Plaintiff.

175.   The Defendants stood in a fiduciary relationship with the Plaintiff.

176.   The Defendants exploited their fiduciary relationship by deceiving the Plaintiff regarding the parties' respective rights and duties under the subject RISCs, and concealing the nature of Defendants' conduct (misconduct).

177.   The Defendants exploited their fiduciary relationship in causing the Plaintiff's delay in bringing this action.

178.   The Defendants breached their duty of good faith and fair dealing as follows:

    a)   Unlawfully, arbitrarily, capriciously, and, in bad faith, denying their duties and obligations under the RISC;

b)      Denying their duties under the RISC to deny Plaintiff the benefits to which he was entitled under RISCs;

c)      Concealing the unlawful nature of their conduct;

d)      In general, by self-dealing to the substantial detriment of Plaintiff and in violation of the provisions of the agreement and the parties' agreements, understandings.

179.     By its aforesaid conduct, breaches, violations and failures, Defendants failed to discharge their professional and fiduciary duties with the care, skill, prudence and diligence under the circumstances then prevailing as required by a prudent person or entity acting in a like capacity and familiar with such matters.

180.     By its aforesaid conduct, breaches, violations and failures, Defendant violated and failed to discharge adequately his professional and fiduciary duties.

181.     Defendants' aforesaid breaches of its duty of good faith and fair dealing and violations of their professional and fiduciary responsibilities caused Plaintiff to suffer the damages outlined above and below.

**COUNT VI**
**VIOLATION OF THE UNIFORM COMMERCIAL CODE**
**PLAINTIFF v. CREDIT ACCEPTANCE**

182.     Plaintiff incorporates all facts and allegations set forth in this Complaint.

183.     The Plaintiff fulfilled all of her duties and obligation under the subject contract(s) and/or he was prevented from performing by the Defendants' misconduct.

184.     The Plaintiff did not default under the subject contract.

185.     Because plaintiff did not default under the subject contract, no one had right to take the vehicle and/or to deprive her of the possession, use and value of the vehicle.

186.    Plaintiff sent defendant Credit Acceptance a request for an accounting, statement of account and a list of collateral, among other things, pursuant to 13 Pa.C.S.A. § 9210 (Exhibit E).

187.    Defendant Credit Acceptance never responded to plaintiff's request.

188.    After having the vehicle taken, no one sent plaintiff a notice by certified or registered mail or by hand-delivery as required by UCC Sections 9613-9614and MVSFA Section 623.

189.    The aforementioned violations of the UCC entitle Plaintiff individually to actual and statutory damages pursuant to 13 Pa.C.S.A. § 9625 related to each individual contract.

**COUNT VII**
**CIVIL CONSPIRACY**
**PLAINTIFF v. ALL DEFENDANTS**

190.    Plaintiff incorporates by reference all facts and allegations set forth in this Complaint.

191.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

192.    The Defendants jointly and severally, substantially contributed, substantially assisted and acted in concert with each other in the misconduct described above and below to their mutual economic benefit.

193.    The defendants jointly and severally conspired with each other, substantially contributed, substantially assisted and acted in concert with each other by misrepresenting or concealing the vehicle's history, condition and value, by misrepresenting or concealing the seller and the parties respective rights and duties under the RISC, by failing or refusing to request or demand that the each other terminate their misconduct, by failing or refusing to terminate their agreements with each other, by failing or refusing to report each other to the appropriate authorities, by failing or refusing to advise consumers that each other's conduct was unlawful.

194. The defendants had knowledge of their respective overt acts, omissions, evasions, and concealments, which have contributed to plaintiffs' damages and losses.

**COUNT VIII**
**VIOLATIONS OF THE FAIR CREDIT EXTENSION UNIFORMITY ACT(FCEUA)**
**73 P.S. § 2270.1 et. seq.**
**AND THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER**
**PROTECTION LAW (UTPCPL)**
**73 P.S. § 201-1 et. seq.**
**PLAINTIFF V. ALL DEFENDANTS**

195. Plaintiff incorporates all facts and allegations set forth in this Complaint.

196. Defendant Credit Acceptance is a "creditor" and the remaining defendants are "debt collectors" as defined by 73 P.S. § 2270.4 of the FCUEA.

197. Plaintiff is a "consumer" as defined by 73 P.S. § 2270.4 of the FCUEA.

198. Insofar as the repossession of the subject vehicle was executed without a present right of possession in connection with a fraudulently originated and unenforceable RISC, the defendants took the vehicle without right.

199. Neither Credit Acceptance nor the other defendants, or anyone, had right to the vehicle's possession insofar as the neither the RISC nor the UCC or MVSFA permits non-judicial repossession of the vehicle where there is no default.

200. Credit Acceptance refused to acknowledge its liability for the seller's and/or repossessors' misconduct and/or has sought to enforce an unenforceable contract.

201. As a result of the repossession by defendants, plaintiff has lost the unfettered use and enjoyment, loss of value of the vehicle and the value of her asset, emotional distress, and damage to his credit ratings and reputation.

202. All of the above contacts by Defendants were "communications" relating to a debt as defined by 73 P.S. § 2270.3 of the FCUEA.

203.    The foregoing acts and omissions of these Defendants constitute numerous and multiple violations of the FCEUA and UTPCPL, including but not limited to 73 P.S. § 2270.4(a), as evidenced by the following conduct:

        a)     Engaging in conduct the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt;

        b)     The use of false, deceptive or misleading representations or means in connection with the collection of a debt;

        c)     Making false, deceptive, or misleading representations with regard to the character, amount or legal status of the alleged debt;

        d)     The use of false representation or deceptive means to collect a debt or obtain information about a consumer;

        e)     The use of unfair or unconscionable means to collect or attempt to collect an alleged debt;

        f)     Attempting to collect any amount not authorized by agreement or permitted by law.

204.    Defendants' acts as described above were done with malicious, intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law with the purpose of coercing Plaintiff to pay the debt.

205.    As a result of the above violations of the FCUEA and UTPCPL, Plaintiff has suffered ascertainable loss in the value of the vehicle entitling her to an award of statutory, actual and treble damages and attorney's fees and costs.

**COUNT IX**
**CONVERSION**
**PLAINTIFF V. ALL DEFENDANTS**

206.    Plaintiff incorporates all facts and allegations set forth in this Complaint.

207.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

208.    Pursuant to its established business practices established and implemented by all the Defendants, without right or justification, Defendants took possession, dominion and/or control of Plaintiff's vehicle and denied plaintiff use and quiet enjoyment thereof and withheld and refused to return it.

209.    As a result of the Defendants' misconduct, the Plaintiff was deprived of the use and enjoyment of the subject vehicle, the use and enjoyment of the amount financed, will incur costs and expenses for replacement vehicles, incurred inconveniences and frustration, together with the other damages set forth above and below.

210.    The defendants' individual and collective acts and/or omissions were substantial contributing factors and causes of violations of the duties as set forth in this Count and to plaintiff's indivisible harm and damages more fully described above and below, and render the defendants jointly and severally liable to the plaintiff.

## COUNT X
## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES
## PLAINTIFFS v. ALL DEFENDANTS

211.    Plaintiffs incorporate by reference all facts and allegations set forth in this Complaint.

212.    As the assignee of the RISC, Credit Acceptance is subject to all of the same claims as the dealer defendants.

213.    The actions and omissions of Defendants as hereinbefore and hereinafter described constitute violations of the Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa.C.S.A. § 201-1 *et. seq.*, which are in-and-of-themselves fraudulent, deceptive and misleading, constituting violations of the Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S.A. § 201-1 et. seq.

214.   The actions and omissions of Defendants has hereinbefore and hereinafter described constitute violations of the following sections of the UTPCPL 73 P.S. § 201-2(4):

> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

> (vi) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

> (ix) Advertising goods or services with intent not to sell them as advertised;

> (xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

**Pennsylvania Automotive Industry Trade Practices**

215.   The defendants actions, including misrepresenting the vehicle's history, condition and value, misrepresenting the seller and the terms and conditions of the sale and finamncing, as set forth in more detail above and below, and/or the respective sales documents, violated the following provisions of the Pennsylvania Automotive Industry Trade Practices:

§ 301.2. Advertising and sales presentation requirements
(1) The use of different type, size, style, location, sound, lighting or color, so as to obscure or make misleading a material fact in an advertisement or sales presentation.
(2) The misrepresentation in any way of the size, inventory or nature of the business of the advertiser or seller; the expertise of the advertiser or seller or his agents or employes; or the ability or capacity of the advertiser or seller to offer price reductions.
(3) The use of an advertisement or sales presentation as part of a plan or scheme not to sell the vehicles or services advertised, or both, or not to sell the vehicles or services advertised or presented at the advertised price. The following will be *prima facie* evidence of a plan or scheme not to sell the motor vehicles or services or not to sell the vehicles or services at the advertised or represented prices:
> (i) Refusing to show, display, sell or otherwise provide the goods and services advertised in under the terms of the advertisement.

(ii) Disparaging by act or word the advertised goods and services; the warranty; the credit terms; the availability of service, repairs or parts; or anything which in any other respect is a material fact connected with the sale of the advertised goods and services.

(iii) Refusing to take orders for advertised goods and services or taking orders at a price greater than the advertised price.

(iv) Showing, demonstrating or delivering advertised goods or services which are obviously defective, unusable or unsuitable for the purpose represented or implied in the advertisement or sales presentation.

(4) The failure or refusal to sell a motor vehicle or other goods or services under terms or conditions, including price or warranty, which a motor vehicle manufacturer or dealer or repair shop has advertised or otherwise represented.

(5) The representation in an advertisement or sales presentation that a motor vehicle or motor vehicle goods or services are of a particular style, model, standard, quality or grade if they are of another or if the representation conflicts with a written notice or disclosure required under this chapter.

(6) The making of a representation or statement of a fact in an advertisement or sales presentation if the advertiser or salesperson knows or should know that the representation or statement is false and misleading or if the advertiser or salesperson does not have sufficient information upon which a reasonable belief in the truth of the representation could be based.

§ 301.4. General provisions -- motor vehicle dealer

(a) With regard to a motor vehicle dealer, the following will be considered unfair methods of competition and unfair or deceptive acts or practices:

(2) Using a printed or written contract form agreement, receipt or invoice in connection with the sale of a motor vehicle which is not clearly identified and which does not contain the following:

(i) The name and address of the dealer and purchaser.

(iii) A description of the purchased vehicle as either "new" or "used" and, if used, a brief description of its prior usage such as "executive," "demonstrator," "reconstructed," or any prior usage which is required to be noted on a Pennsylvania Certificate of Title or which appears on the title of any state through which the dealer has acquired ownership.

(iv) The total contract price, including an itemized list of charges for repairs, services, dealer-installed optional accessories and documentary preparation which are not included in the purchase price.

(4) Using in a motor vehicle purchase contract a liquidated damage clause or similar clause which requires the forfeiture of a purchaser's deposit or security when the purchaser cancels or breaches the contract unless: the clause contains a specific dollar amount or item to be retained by the dealer; the clause is clear and conspicuous; the purchaser assents to the clause by initialing the same; and the clause is not otherwise unlawful.

(6) Failing to refund the full amount of a purchaser deposit promptly when:

(iv) The dealer fails to deliver to the purchaser a motor vehicle which conforms to the terms of the contract.

(9) Where no express warranty is given, attempting to exclude the implied warranties of merchantability and fitness for a particular purpose in the sale of a motor vehicle purchased primarily for personal, family or household purposes unless the following notice in at least 20-point bold type is prominently affixed to a window in the motor vehicle so as

to be easily read from the outside and is brought to the attention of the prospective purchaser by the seller:

This vehicle is sold *without* any *warranty*. The purchaser will bear the *entire expense* of repairing or correcting any defects that presently exist and/or may occur in the motor vehicle unless the salesperson promises *in writing* to correct such defect or promises in *writing* that certain defects do not exist.

This paragraph prohibits the use of the term "AS IS" unless the sales contract, receipt, agreement or memorandum contains the following information in a clear, concise and conspicuous manner on the face of the document; the notice shall be in addition to the window statement required by this paragraph and may not contradict an oral or written statement, claim or representation made directly or by implication with regard to the quality, performance, reliability or lack of mechanical defects of a motor vehicle which is offered for sale:

AS IS

*THIS MOTOR VEHICLE IS SOLD AS IS WITHOUT ANY WARRANTY EITHER EXPRESSED OR IMPLIED. THE PURCHASER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING OR CORRECTING ANY DEFECTS THAT PRESENTLY EXIST OR THAT MAY OCCUR IN THE VEHICLE.*

(10) Failing to forward to the proper Commonwealth agency amounts and forms tendered by a purchaser, such as sales tax and transfer and registration fees, within the time prescribed by law.

### Pennsylvania Motor Vehicle Sales Finance Act

216.    Defendants Prime Motors, S&S Auto Sales and Credit Acceptance are licensed pursuant to 69 P.S. § 604.

217.    Pursuant to 69 P.S. § 610 Defendants licenses may be revoked if it has violated any provision of the MVSFA.

218.    Pursuant to 69 P.S. §§ 610 and 612, defendants must maintain satisfactory records to determine that the business is being operated in accordance with the MVSFA and may not falsify any records.

219.    Defendants violated 69 P.S. §§ 610 and 613-615 by defrauding the plaintiffs.

220.    Defendants violated 69 P.S. §§ 610 and 613-615 by failing willfully to perform a written agreement with the plaintiffs.

221.    Defendants charged improper, unlawful, false or excessive amounts for Title Certificate transfer, lien recording, tire tax, documentary fee and registration.

222.    If the attached RISC and MV-4ST and MV-1 are accurate, then Defendants violated 69 P.S. §§ 610 and 618 by collecting any tax or fee to be paid to the Commonwealth and then failing to issue a true copy of the tax report to the purchaser.

223.    Upon information and belief, Defendants violated 69 P.S. §§ 610 and 618 by issuing a false or fraudulent tax report.

224.    Defendants violated 69 P.S. § 610 by engaging in unfair, deceptive, fraudulent or illegal practices or conduct in connection with any business regulated under the MVSFA.

225.    Plaintiffs claim all damages to which they are entitled arising from Defendants' violations of the Unfair Trade Practices and Consumer Protection Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that judgment be entered against the Defendants for the following:

A.  Declaratory judgment that the noted defendants' conduct violated the FDCPA, UTPCPL, UCC and FCEUA.

B.  Statutory damages pursuant to 15 U.S.C. § 1692k;

C.  Actual damages for fear and emotional distress;

D.  Reasonable attorney fees and costs.

E.  Damages under the U.C.C. as described herein;

F.  Actual damages for loss of the use and value of the vehicle;

G.  Treble damages, punitive damages, pursuant to the FCEAU and UDAP.

H.    Punitive damages.

BENSLEY LAW OFFICES, LLC


BY: _____
        WILLIAM C. BENSLEY
        **Attorney for Plaintiffs**